UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**ANN FREE**,

    **Plaintiff**,

v.                                             Case No. 3:20cv4326-TKW-HTC

**LITTLEFIELD CORPORATION,**
**et al.**,

    **Defendants**.
_____/

## ORDER DENYING SUMMARY JUDGMENT

This case is before the Court on the motion for summary judgment filed by Defendants Littlefield Corporation, Pensacola One, Inc., and Richard Bunkley (collectively "the Littlefield Defendants") (Doc. 27). Upon due consideration of the motion, Plaintiff's response (Doc. 29), the Littlefield Defendants' reply (Doc. 30), and the evidence submitted by the parties (Attachments to Docs. 27, 28), the Court finds that the motion is due to be denied.

### Facts[1]

Plaintiff worked as a "floor worker" at the Town & Country Bingo Hall (T&C) in Pensacola from 2011 to July or August 2019. Her job duties included

---

[1] The facts are summarized in the light most favorable to Plaintiff as the non-moving party, and all inferences are drawn in Plaintiff's favor. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).

selling bingo cards, calling the numbers during bingo games, assisting the bingo players, serving as a cashier, and cleaning the facility.

Pensacola One owned and operated T&C and leased[2] space in the facility to local charities to conduct bingo games. Pensacola One also charged the charities fees for using bingo equipment and a company affiliated with Littlefield, AHM Management, charged the charities for bookkeeping and accounting services related to their bingo operations.

Pensacola One is a subsidiary of Littlefield Corporation, which bills itself as "the largest owner of charitable bingo halls in the United States." Richard Bunkley is the chief operating officer (COO) of Littlefield and a vice president (VP) of Pensacola One, but his paycheck comes from AHM Services,[3] which has common ownership with Littlefield.

The floor workers at T&C were paid though Defendant Pensacola Charitable Bingo Association,[4] which was affiliated with Littlefield through AHM Management and used the same Texas post office box as the president and chief executive officer of Littlefield and Pensacola One.

---

[2] Technically, the leases were sub-leases because Pensacola One only had a leasehold interest in the shopping center where T&C was located.

[3] Mr. Bunkley testified that AHM Services and AHM Management are the same entity.

[4] The Association was served, *see* Docs. 5-1, 13, but it has not filed any pleadings or papers in this case.

Plaintiff received a W-2 tax form from the Association, and the Association wrote the checks to the charities for the net proceeds of the bingo games.

Mr. Bunkley testified in deposition that the Association predated Littlefield's acquisition of Pensacola One and that it is "not really a legal entity" but rather is "an informal partnership for the charities to use as a joint banking account." More specifically, Mr. Bunkley described the Association as a "payroll entity."

Mr. Bunkley testified that the floor workers were being paid by the charities (not Pensacola One or Littlefield) for custodial duties (e.g., wiping down the tables) and they were merely "volunteering" for any bingo-related duties (e.g., calling bingo) in order to comply with Florida law. Mr. Bunkley admitted that this sounded "silly" and "kooky," but he claimed that this business structure was approved by a "local bingo regulator" when the Littlefield Defendants acquired T&C in 2008.

Plaintiff and the other floor workers were paid a set amount per shift and they also received tips from the bingo players. Plaintiff was paid $40 or $50 per shift and her tips ranged from less than $30 to more than $100 per shift. Plaintiff depended on the money she received from her work at T&C to support her family and pay her bills.

In March 2018, Mr. Bunkley informed the charities that leased space at T&C that they needed to provide direct management and oversight of the facility and that the floor workers could no longer be paid. He also told the charities that their

3

members had to operate the bingo games and that they could "recruit the current workers to become bona fide members of the charity" to operate the games. He noted that "[t]he current workers seem[ed] willing to stay on board presumably for tips."

Around the same time, Mr. Bunkley met with Plaintiff and other floor workers and told them that they were no longer going to be paid for her work at T&C because "a recent change in the law" made it illegal to pay individuals involved in the conduct of bingo games.[5]

Plaintiff continued to work at T&C with the same job duties and supervisor after May 2018. The only difference was that the only pay Plaintiff received after that date was tips from bingo players.[6]

---

[5] There was no "recent" change in the law. Since 2007, Florida law had required that "[e]ach person involved in the conduct of any bingo game . . . must be . . . a bona fide member of the [charitable] organization sponsoring such game and may not be compensated in any way for operation of such game." §849.0931(8), Fla. Stat. The only recent legal development was that, in September 2017, the Eleventh Circuit reversed the dismissal of a federal criminal indictment against two individuals who were operating a bingo establishment in much the same way as the Littlefield Defendants were operating T&C. *See United States v. Masino*, 869 F.3d 1301 (11th Cir. 2017) ("If . . . the government can prove that [the defendants' business] illegally allows charities to sponsor bingo games without their direct involvement . . ., then a jury could find that [it] is an illegal gambling business.").

[6] Despite the statutory prohibition of compensation of persons involved in the conduct of bingo games, Florida law does not prohibit such persons from receiving tips from the bingo players. *See State v. S. Cty. Jewish Fed'n*, 491 So.2d 1183, 1187 (Fla. 4th DCA 1986) ("The tips the persons receive are not compensation. . . . . [T]he monies received are not quid pro quo for work . . . . [R]ather, the monies are merely indicative of the generosity of the players.").

Plaintiff was not a bona fide member of any of the charities that conducted bingo games at T&C, either before or after May 2018. She never filled out any volunteer paperwork with the charities.

T&C's operations did not materially change after May 2018. The facility's "hall manager," who reported through a regional manager to Mr. Bunkley, continued to set the floor workers' schedules and prescribe their job duties, and if the workers wanted their share of the tips, they had to stay at the facility until all of the customers left, all of the manager's paperwork was complete, and any cleaning or other issues were resolved.

At the end of April 2018, the hall manager sent an email to the charities with a list of the floor workers' names and contact information. The hall manager assumed that the floor workers became volunteers and bona fide members of the charities based on this email, but they she admitted that she did not know whether any of the floor workers ever had any real relationship with the charities. Similarly, Mr. Bunkley speculated that the floor workers had always been "token members" of the charities.

Before May 2018, the charities' involvement in T&C was limited to "picking up [their] checks" from the hall manager. The checks represented the net proceeds of the bingo games conducted on behalf of the charities and were viewed by the charities as "donations."

After May 2018, representatives of the charities started to attend "board meetings" (presumably of the Association) where they "voted on a couple of things" concerning the operation of T&C. Attendance "fizzled out" after a couple of meetings and months went by without any board meetings. During this time, the hall manager was still running the day-to-day operations of T&C and providing the same daily, weekly, and monthly reports to Mr. Bunkley and the regional manager who reported to him that she had provided prior to May 2018.

Before and after May 2018, all operational decisions concerning T&C were made by Mr. Bunkley (or individuals who reported to him), not the Association or the individual charities.

## Procedural History

In March 2020, Plaintiff filed suit against Defendants in this Court. The complaint, as amended (Doc. 15), alleged that Defendants violated the Fair Labor Standards Act (FLSA)[7] and the Florida Minimum Wage Act (FMWA)[8] by not paying her minimum wage or overtime pay for her work at T&C. In their answer (Doc. 19), the Littlefield Defendants denied Plaintiff's allegations and asserted that Plaintiff was a volunteer for the charities that leased space at T&C, not an employee of the Littlefield Defendants.

---

[7] 29 U.S.C. §201 *et seq.*

[8] §448.110, Fla. Stat. (implementing art. X, §24, Fla. Const.).

6

After discovery closed, the Littlefield Defendants moved for summary judgment on all the claims alleged in the amended complaint. The motion was fully briefed and is ripe for a ruling. No hearing is necessary.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if it would change the outcome of the litigation, and a dispute about a material fact is genuine if the record evidence could lead a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018) (citations omitted). Once the moving party has met its burden, the non-moving party must put forward specific facts showing a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## Analysis

The FLSA requires employers to pay their employees not less than the minimum wage set by statute, *see* 29 U.S.C. §206, and it also requires employers to pay their employees overtime pay for any hours worked beyond a 40-hour workweek at a rate not less than 1.5 times the employee's regular rate of pay, *id.* at §207(a).

7

The FMWA requires employers in Florida to pay their employees the annually adjusted "state minimum wage" that exceeds the federal minimum wage. §448.110(3)-(4), Fla. Stat.; *see also* art. X, §24(c), Fla. Const.

To establish a claim for failure to pay minimum wage or overtime pay under the FLSA (or failure to pay the state minimum wage under the FMWA[9]), the plaintiff must establish that "(1) [s]he is employed by the defendant, (2) the defendant engaged in interstate commerce, and (3) the defendant failed to pay [her] minimum or overtime wages." *Freeman v. Key Largo Volunteer Fire & Rescue Dep't., Inc.*, 494 F. App'x 940, 942 (11th Cir. 2012). Here, only the first element is in dispute, with Plaintiff arguing that she was Defendants' employee and the Littlefield Defendants arguing that Plaintiff was a volunteer for the charities that leased space at T&C to conduct bingo games.

The FLSA defines "employee" to mean "any individual employed by an employer." 29 U.S.C. §203(e)(1). This definition does not include volunteers who work "without promise or expectation of compensation, but solely for [their] personal purpose or pleasure." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471

---

[9] "The FMWA is to be interpreted as consistent with the FLSA." *Llorca v. Sheriff, Collier Cty.*, 893 F.3d 1319, 1328 (11th Cir. 2018); *see also* art. X, §24(b), Fla. Const. (providing that the terms "employer," "employee," and "wage" used in the FMWA "shall have the meanings established under the federal Fair Labor Standards Act (FLSA) and its implementing regulations").

U.S. 290, 295 (1985) (quoting *Walling v. Portland Terminal Co.,* 330 U.S. 148, 152 (1947)).

The parties' characterization of their relationship is not dispositive of whether an individual is an employee or a volunteer. *Id.* at 300-02. Instead, "[t]he test of employment under the [FLSA] is one of 'economic reality.'" *Id.* at 301 (citing *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33 (1961)); *see also Brouwer v. Metropolitan Dade County*, 139 F.3d 817, 819 (11th Cir. 1998) ("To determine whether an employment relationship existed, we look at the 'economic reality' of all the circumstances.").

"The economic reality test includes inquiries into: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997). The same factors are considered when determining whether two separate entities are the employee's joint employer.[10] *See* 29 C.F.R. §791.2(a)(1); *see also Peppers v. Cobb County*, 835 F.3d

---

[10] Plaintiff argues in her response in opposition to the motion for summary judgment that Littlefield Defendants are liable as "joint employers" regardless of the corporate structure of the their enterprise with the Association and the charities at T&C because the Littlefield Defendants controlled the essential terms of her employment by and through the hall manager. *See* Doc. 29, at 30-31. The Littlefield Defendants do not respond to this argument in their reply, and as discussed below, there is evidence from which a reasonable jury could find in favor of Plaintiff on this issue.

1289, 1300 (11th Cir. 2016) ("[T]he joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.") (quoting *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 (11th Cir. 1994)) (emphasis in original); *Josendis v. Wall to Wall Residence Repairs Inc.*, 662 F.3d 1292, 1298 (11th Cir. 2011) ("[A] covered employee may file suit directly against an employer that fails to pay him the statutory wage, or may make a derivative claim against any person who (1) acts on behalf of that employer and (2) asserts control over conditions of the employee's employment.").

Here, there is considerable evidence from which a reasonable jury could find that the Littlefield Defendants were Plaintiff's employer (or at least a joint employer) even though she nominally received her W-2 tax form from the Association.  For example, there is evidence that Mr. Bunkley, in his capacity as COO of Littlefield and a VP of Pensacola One, was ultimately responsible for the operational decisions of T&C; that it was the hall manager who reported to Mr. Bunkley—not the Association or the individual charities—who supervised and controlled the floor workers' schedules and conditions of employment and had the authority to hire and fire them; that it was Mr. Bunkley, not the Association or the individual charities, who made the decision to stop paying the floor workers; that the Littlefield Defendants maintained the payroll records for the floor workers and paid them using

a "payroll entity" in Texas affiliated with Littlefield; and that Littlefield and Pensacola One financially benefitted from the decision to stop paying Plaintiff and the other floor workers.

Moreover, there is evidence from which a reasonable jury could find that Plaintiff was not a "bona fide member" of the Association or any of the individual charities that leased space at T&C because Plaintiff testified that she was never a member of any of the charities that leased space. *See S. Cty. Jewish Fed'n*, 491 So. 2d at 1187 ("'Bona fide member' merely means the person is properly enrolled in the organization by paying dues and complying with the membership requirements."). This testimony was corroborated by the deposition testimony of a representative of one of the charities that leased space at T&C who denied that her organization ever made any of the floor workers members of the charity. Indeed, the only evidence to the contrary is speculation from the hall manager that the floor workers became members of the charities after the hall manager emailed their names and contact information to the charities in April 2018, and Mr. Bunkley's speculation that the floor workers had always been "token members" of the charities.

The Court did not overlook the Littlefield Defendants' argument that they could not pay Plaintiff the wages required by the FLSA and the FMWA without violating the bingo statute and subjecting themselves to criminal liability. Although this is a correct statement of the law, it has no bearing on the question of whether

Plaintiff was an employee of the Littlefield Defendants and thus entitled to be paid in accordance with the FLSA and FMWA. Indeed, the fact that the Littlefield Defendants could not pay Plaintiff for her work at T&C without violating the bingo statute did not stop them from doing so (through the Association) prior to May 2018. Likewise, the fact that Plaintiff was no longer paid after May 2018 does not mean that she was no longer the Littlefield Defendant's employee after that point because, as discussed above, there is evidence from which a reasonable jury could find that the "economic reality" of the parties' relationship after May 2018 was exactly the same as it was before.

The Court also has not overlooked the Littlefield Defendants' preemption arguments, but they are largely red herrings because the Court sees no irreconcilable conflict between the bingo statute and the FLSA. Indeed, the Littlefield Defendants could have structured their operations in a way that would comply with both laws since the bingo statute authorizes bona fide members of charitable organizations to operate bingo games without compensation and the FLSA does not apply to individuals who perform work without promise or expectation of compensation and solely for their own personal purpose or pleasure. Although that appears to be what the Littlefield Defendants attempted to do (at least on paper) starting in March 2018, there is evidence from which a reasonable jury could find that they did not actually do so (in practice), and in any event, the Littlefield Defendants cannot rely on state

law to avoid their obligations under the FLSA because it is well established that federal law trumps state law in the event of a conflict. *See Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008) ("Where [federal and state law] conflict, federal law trumps state law; that was always clear.").

## Conclusion

In sum, because there is evidence from which a reasonable jury could find that Plaintiff was an employee of the Littlefield Defendants and not a bona fide member of the charities that leased space at T&C to conduct bingo games, the Littlefield Defendants are not entitled to summary judgment on Plaintiff's FLSA and FMWA claims. Accordingly, it is

**ORDERED** that:

1. The Littlefield Defendants' motion for summary judgment (Doc. 27) is **DENIED**.

2. Within 10 days from the date of this Order, the parties shall confer and provide the Court several mutually agreed-upon dates and times during the weeks of January 4 and January 11, 2021, for a telephonic case management conference to set this case for trial.

**DONE and ORDERED** this 11th day of December, 2020.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**